**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Ashwood Computer Co., Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:20-cv-00029 |
| | ) | |
| vs. | ) | Judge Michael R. Barrett |
| | ) | |
| Zumasys, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**OPINION & ORDER**

Pending before the Court are the motions to dismiss Plaintiff's Second Amended Complaint filed by Defendants Zumasys, Inc. and jBASE International, Inc. (Doc. 81) and Defendant Cook Inc. (Doc. 82), which are fully briefed (*see* Docs. 83/86[1], 84/87[2], 89, 90) and ripe for decision.  Both motions are filed pursuant to Fed. R. Civ. P. 12(b)(6), which allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Both motions will be granted in part and denied in part.

---

[1] Plaintiff refiled its response (Doc. 83) to Zumasys and jBASE's Rule 12(b)(6) motion at the Clerk's instruction (Doc. 85) to comply with S.D. Ohio Civ. R. 5.1 (c), which requires that all (electronically filed) documents be text-searchable.  To the extent a reference is necessary, the undersigned will cite to (Doc. 86).

[2] Plaintiff refiled its response (Doc. 84) to Cook's Rule 12(b)(6) motion at the Clerk's instruction (Doc. 85) to comply with S.D. Ohio Civ. R. 5.1 (c), which requires that all (electronically filed) documents be text-searchable.  To the extent a reference is necessary, the undersigned will cite to (Doc. 87).

## I.     BACKGROUND

### A.  The Parties & Subject-Matter Jurisdiction

Plaintiff Ashwood Computer Co., Inc. ("Ashwood") is an Ohio corporation with its principal place of business located in Cincinnati, Ohio.  (Doc. 79 (¶ 1)).

Defendant Zumasys, Inc. ("Zumasys") is a California corporation with its principal place of business located in Irvine, California.  (*Id.* (¶ 3)).  Defendant jBASE International, Inc. ("JII") is an Oregon corporation with its principal place of business located in Irvine, California.  (*Id.* (¶ 2)).

Defendant Cook Inc. ("Cook") is an Indiana limited liability corporation with its principal place of business located in Bloomington, Indiana.  (*Id.* (¶ 5)).[3]

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because there is complete diversity between the parties and the amount in controversy is satisfied.  (Doc. 79 (¶ 8); *see id.* (¶¶ 157, 166, 173, 179, 190, 207, 214, 224, 275)).

### B.  Facts Alleged in Plaintiff's Second Amended Complaint

Plaintiff Ashwood "specializes in providing sales assistance, programming services assistance and systems support services for MultiValue database users" across the United States.  (*Id.* (¶ 16)).  Put another way, Ashwood is "a full-service value-added reseller [hereinafter 'VAR'] and systems integrator with extensive experience."  (*Id.*).  "The

---

[3] Plaintiff's original and First Amended Complaint named "Cook Medical, Inc." as a defendant.  The parties later stipulated that Cook Inc. is the proper party Defendant and should be substituted for "Cook Medical, Inc."  (*See* Doc. 32).  Plaintiff's (operative and later filed) Second Amended Complaint names a different entity, "Cook Medical, LLC" as a defendant.  The Court will overlook this scrivener's error given Defendant Cook Inc.'s reference to the stipulation in its pending motion to dismiss (Doc. 82 PAGEID 2306).

principal business of a VAR is to acquire the appropriate licenses from software producers, like JII, Rocket Software, IBM, Oracle, SAP and others and to sub-license and install and implement and service that software for use by the VAR's end-users." (*Id.* (¶ 33)). VARs like Ashwood purchase licenses from software producers under one contract and resell the licenses to their end-users under a separate contract. (*See id.* (¶ 39)).

Ashwood alleges that the business relationship between it and software producer jBASE is (or, at least, was) governed by the "Value Added Reseller Agreement" ("VAR Agreement")[4] that JII sent to Ashwood in February 2004. (*See id.* (¶ 18)). This Agreement "was intended as a written memorialization of the terms under which the parties had been doing business with each other for the prior fifteen (15) years." (*Id.* (¶ 22)). "With few modifications, having to do only with pricing and discounts, [Ashwood] and JII have been continuously operating under the terms of the . . . VAR Agreement from May 2004 to the present." (*Id.* (¶ 24)).

Under the 2004 VAR Agreement, Ashwood agreed to purchase jBASE software licenses from JII and then sub-license them to its own end-users. (*Id.* (¶¶ 25, 26)). In return, Ashwood earned renewal and monthly service fees on each sub-license it sold as long as Ashwood's end-user continued to use jBASE software. (*Id.* (¶ 27); *see id.* (¶¶ 53, 54)). Defendant Cook was one of Ashwood's end-users. (*See id.* (¶¶ 30, 32)). Cook began as a "small Indiana medical device manufacturer" that has since "grown into a multi-national company with annual sales of $3,000,000,000.00[.]" (*Id.* (¶¶ 36, 37)). Over

---

[4] (Doc. 79-1).

the past 20 years, Ashwood "grew" the number of sub-licenses sold to Cook from a few dozen to over 6,000.  (*Id.* (¶ 32); *see id.* (¶ 47)).[5]  "Cook has become the largest end user in the world of jBASE software."  (*Id.* (¶ 48); *see id.* (¶ 58)).

Ashwood requires all its end-users, Cook included, to enter into a service agreement.  (*Id.* (¶ 51)).  The most recent Master Sales, License, and Support Agreement ("Master Agreement")[6] between Ashwood and Cook was executed in 2012.  (*Id.* (¶ 125)).  "[E]ach jBASE license that is separately licensed to a company server to enable the end-user access to the database is subject to an initial sub-licensing fee of $500.00 per license and a monthly license and support fee of approximately $6.00 to $13.00 per month depending on each license's capability."  (*Id.* (¶ 55)).[7]  Both fees must be paid by the end-user, Cook included, to continue to access its own database.  (*Id.*).

Defendant Zumasys "purchased" JII in 2015.  (*See id.* (¶ 60)).

Beginning in July 2017, Zumasys (through its President Paul Giobbi) made numerous attempts to renegotiate the (current, according to Ashwood) 2004 VAR Agreement to allow JII the right to terminate without cause, which Ashwood resisted.  (*Id.* (¶¶ 61, 62)).  "Concurrently and coincident with Zumasys' efforts to force Ashwood to execute a new agreement in 2017, Cook began to send signals that it wanted to terminate its Service Agreements with Ashwood and to continue with JII instead."  (*Id.* (¶ 63)).  To

---

[5] "Solely on the efforts of Ashwood, as of this writing Cook had acquired and is presently using more than six thousand five hundred and eighty-three (6,583) licenses."  (Doc. 79 (¶ 57)).

[6] (Doc. 79-2).

[7] For each sub-license sale, Zumasys received $250.00 initially and a monthly license and support fee of approximately $2.63 to $7.50 per month depending on each license's capability.  (*See* Doc. 79 (¶ 56)).

this end, Cook sent a notice of termination to Ashwood on October 31, 2017. (*Id.* (¶ 64)). Ashwood responded with letters to both Zumasys and Cook asserting its rights under the (current, according to Ashwood) 2004 VAR Agreement and warning Cook not to interfere with these rights. (*Id.*). Cook thereafter "backed away" from its "termination position" and continued to "use and pay" for Ashwood's services. (*Id.* (¶ 65)).

In June 2019, Giobbi informed Ashwood that he met personally with Cook's IT Manager, David Breedlove. (*Id.* (¶¶ 66, 128)). During that meeting, Breedlove told Giobbi that he wanted Zumasys to eliminate Ashwood as its "Reseller of Record" so that Cook could deal directly with Zumasys. (*Id.* (¶ 66); *see id.* (¶ 128)). Breedlove followed with a letter to Giobbi (dated June 7, 2019) requesting the right to deal "directly" with Zumasys. (*Id.* (¶ 67)). Giobbi made several proposals to Ashwood in this regard, all of which were rejected. (*Id.* (¶¶ 68, 69); *see id.* (¶ 93)). In a letter dated September 9, 2019, Ashwood advised Giobbi that Zumasys "had no contractual right to take over Ashwood's end-user, Cook or deprive Ashwood of the future revenues Ashwood had already earned." (*Id.* (¶ 70); *see id.* (¶ 94)).

Giobbi emailed Ashwood on November 21, 2019, stating he was "putting an end date on Ashwood's role as Zumasys' value added reseller to Cook." (*Id.* (¶ 71)). In a telephone conversation on December 5, 2019, Giobbi informed Ashwood's Rod Owens that Zumasys would terminate its VAR Agreement unless Ashwood "gave up" Cook. (*Id.* (¶ 72); *see id.* (¶¶ 95, 134)). Giobbi followed up with an email dated December 27, 2019, in which he terminated Ashwood's VAR Agreement. (*Id.* (¶ 73)).[8]

---

[8] As a result, Zumasys no longer licenses jBASE software to Ashwood for sub-licensing to Cook or any of Ashwood's other JBASE end-users. (Doc. 79 (¶ 137)).

### C.  Motion Practice and Proceedings to Date

Ashwood's (original) Complaint (Doc. 1) was filed (on January 9, 2020), less than two weeks after the termination.  JII and Zumasys thereafter filed a Rule 12(b)(6) motion to dismiss (Doc. 17), as did Cook (Doc. 19).  Ashwood filed a motion for leave to amend (Doc. 21) and a memorandum in opposition to JII and Zumasys' motion (Doc. 22) (only). The parties then stipulated to Ashwood filing a first amended complaint.  (Doc. 24).  A second round of motions to dismiss followed.  (Docs. 29, 30, 35, 36, 38, 40).  Ashwood filed a motion for a temporary restraining order and preliminary injunction on June 24, 2020.  (Doc. 42).  Discovery and a first round of briefing was completed by August 27, 2020 (Docs. 43, 44, 46, 47), with a hearing date eventually set for September 3, 2020 (06/30/2020, 07/02/2020, 07/09/2020 & 07/10/2020 Minute Entries).  The hearing date was vacated, however, in the wake of General Order 20-25[9], with the parties agreeing to submit the matter on briefs.  (08/27/2020 NOTATION ORDER).  Ashwood filed a supplemental brief (Doc. 48) and, in a letter motion (Doc. 51 PAGEID 1789), asked that the Court "revisit [its] request for a temporary restraining order pending [a] decision on the balance of the motion."  A motion hearing (by telephone) occurred on October 20, 2020.  (10/20/2020 Minute Entry & Doc. 61).  In January 2021, Cook filed an out-of-the-blue response to Ashwood's supplemental brief (Doc. 48) that reads, in part,

> [I]n a show of good faith and in an effort to move toward resolving this dispute, Cook will delete all jBASE software (not just license keys) sub-licensed by Ashwood from its systems and replace it with software and license keys obtained directly from jBASE.  Cook will delete *only* the jBASE software sub-licensed by Ashwood; the

---

[9] General Order 20-25, "In Re: FURTHER ORDER REGARDING COURT OPERATIONS UNDER THE ONGOING EXIGENT CIRCUMSTANCES CREATED BY COVID-19, Further Adjustment to the Reconstitution Plan with Respect to Suspension of Jury Trials, In-Court Proceedings, Naturalizations, and Grand Jury" (S.D. Ohio Aug. 20, 2020).

Master Agreement does not require Cook to delete any non-jBASE software that merely accesses or utilizes jBASE software.  <u>Cook will begin the process on January 4, 2021.</u>  Cook anticipates that <u>it will take nine months</u> to complete the software deletion and replacement. Because Cook did not receive jBASE software via any tangible device, there is nothing tangible to return to Ashwood.

Cook maintains that it has fully complied with its obligations under the Master Agreement with Ashwood, and that it is not required to replace its existing jBASE software.  But in any event, <u>Cook's agreement to delete the Ashwood sub-licensed software moots Ashwood's request for injunctive relief against Cook.</u>

(Doc. 62 PAGEID 1974 (italics emphasis in original, other emphases added)).  JII and

Zumasys filed its "position statement" the next day, stating, in part,

[T]hese Defendants have no objection to Cook continuing to use the jBASE software, and these Defendants will never claim Ashwood should have demanded that Cook remove the jBASE software. Nonetheless, and in response to Cook's desire to delete/reinstall the jBASE software to resolve the dispute, Defendants will work with Cook to complete that work.

Based on the pledge made by Cook to delete/reinstall the jBASE software (Doc. # 62 at PAGEID # 1974), <u>Defendants request that the preliminary injunction be denied as moot.</u>

(Doc. 63 PAGEID 1977 (emphasis added)).  Ashwood immediately took issue with the

proposition that its motions had been rendered moot:

. . . .

Cook's Supplemental Response is troubling in several respects.  First, Cook snubs the Court once again, pronouncing that it has started the process to remove Plaintiff's software knowing full well that Plaintiff's Motion for Preliminary Injunction/TRO seeking to prevent that very action has been fully briefed and argued and simply awaits the Court's decision.  More than that, <u>Cook forgets that the Parties to this action jointly agreed to allow the Court to stay his decision on Plaintiff's TRO motion in order to permit the Court an opportunity to mediate a settlement.  And, the Court has spent no little judicial capital in shuttling between the parties to fashion a more</u>

<u>amicable resolution.  Now, whilst the Court is in the midst of its efforts to mediate a settlement among the parties, (and making no small progress)</u> Cook announces that it intends to take advantage of the situation and is going forward with a process that it had previously misrepresented to the Court had already taken place.

<u>By taking advantage of the Court's offer to mediate a settlement</u>, Cook is effectively altering the status quo among the parties.  <u>Implicit in the parties' agreement to allow the Court to attempt a mediated settlement</u> was the expectation that all parties would stand still while His Honor endeavored to settle this dispute. The Court has deferred rendering a decision on Plaintiff's Motion in order to meet the parties' joint request for the Court to mediate a solution.  <u>The Court has yet to announce that its efforts to mediate a settlement have come to grief.</u>

Yet, Cook now informs the Court that it is altering the contour of the playing field by permitting Zumasys to remove Ashwood's software and to substitute a substantially identical version of the jBASE software that Plaintiff sold to Cook.  <u>How does Cook expect the Court to mediate a settlement if it proceeds in its efforts to alter the status quo between the parties and thereby hamper the Court's efforts?  Plaintiff can easily see how this Court might reasonably conclude that Cook continues to insult it by encouraging the Court's efforts to bring the parties together with one hand and by frustrating those same efforts by altering the status quo among the parties during these negotiations with the other hand.</u>

. . . .

<u>Cook's Supplemental Response reads to Plaintiff as a declaration by Cook of its intention to end the Court's involvement in settlement negotiations.  If that is the case, Cook should directly inform the Court that it no longer wishes to negotiate or to use the Court's assistance in that regard.</u>  If settlement negotiations are at an end, Plaintiff asks that the Court order the Defendants to restrain from changing the software until such time as the Court issues its Order on Plaintiff's Motion for Preliminary Injunction/TRO.  If settlement negotiations are not at an end, Plaintiff would ask the Court to impose a standstill requirement on all parties during the pendency of any such negotiations.

(Doc. 64 PAGEID 1979–81, 1983 (emphases added); *see also* Doc. 65 PAGEID 1987–88).

In the wake of unproductive ex parte calls, the undersigned referred this matter (on February 4, 2022) to the magistrate judge to set and conduct a settlement conference. (Doc. 69).  Over the course of 30 days, Magistrate Judge Bowman attempted to mediate a resolution; she declared impasse on June 2, 2022.  (05/03/2022 & 06/02/2022 Minute Entries).  Not long after, Ashwood agreed to withdraw its motions for injunctive relief (Docs. 42, 51) but asked the Court to rule on the then-pending motions to dismiss. (07/12/2022 Minute Entry).  At Ashwood's request, and because no rulings had yet issued, the undersigned held a follow-up status conference.  (03/30/2023 Minute Entry). The next day, and to the Court's surprise, Ashwood moved for leave to amend its complaint a second time.  (Doc. 71).[10]  After hearing from Cook in opposition (Doc. 72) and Ashwood in reply (Doc. 73), the Court granted Ashwood's motion (on May 24, 2023).[11]  (Doc. 74).  The final version of Plaintiff's Second Amended Complaint ("SAC") (Doc. 79) wasn't filed until more than a month later (on June 27, 2023), with the instant motions to dismiss (Docs. 81, 82) following.  Briefing was complete on August 21, 2023. (Doc. 90).

---

[10] Ashwood explained that its proposed second amended complaint contained "additional allegations of fact" that occurred post-March 10, 2020, the date it filed its Amended Complaint (Doc. 25).  (Doc. 71 PAGEID 2002). It also included a breach of contract claim against Cook and "updated" its claims for tortious interference with contract "to include allegations that Zumasys, Inc. has interfered with the contracts and business relationships between Ashwood and Ashwood's other [than Cook] jBase customers."  (*Id.* PAGEID 2002–03).

[11] Citing *Foman v. Davis*, 371 U.S. 178, 182 (1962), Cook opposed amendment based on Ashwood's "extraordinary delay." (Doc. 72 PAGEID 2065–66, 2070).  However, it failed to argue that it would suffer *any* (much less *significant*) prejudice (if Ashwood amended a second time) as required by Sixth Circuit case law.  *See Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 641 (6th Cir. 2018).  Nor could it, the undersigned noted, because, "based on the multiple filings in this case, to include status conferences, letter communications, and testimony in support of Ashwood's since withdrawn motion for injunctive relief[,    ] delay has worked handily in Cook's favor."  (Doc. 74 PAGEID 2079).

On April 2, 2024, Ashwood filed a motion (Doc. 94) to refer the pending Rule 12(b)(6) motions to a magistrate judge, citing S.D. Ohio Civ. R. 72.2.  However, Local Rule 72.2 must be read in conjunction with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72, which do not allow a district judge to designate a magistrate judge to decide a dispositive matter.[12]  Instead, a district judge can designate a magistrate judge to enter a recommended decision, to which the parties may then object.  This process would not bring the time economy of scale that Ashwood imagines.  By entry of this Opinion & Order, the undersigned renders moot Ashwood's request for a referral.  Accordingly, Plaintiff's Motion for the Court to Assign a Magistrate Judge to Rule on Defendants' Motions to Dismiss (Doc. 94) is hereby **DENIED as moot**.

### D.  Causes of Action Pled by Ashwood in its Second Amended Complaint

Ashwood's SAC asserts ten causes of action: breach of contract (against JII and Zumasys) (Count I); breach of the implied covenant of good faith and fair dealing (against all defendants) (Count II); promissory estoppel (against all defendants) (Count III); unjust enrichment (against all defendants) (Count IV); tortious interference with a contract (against all defendants) (Count V); tortious interference with a business relationship (against all defendants) (Count VI); unfair business practices in violation of Mass. Gen. Laws ch. 93A (against JII and Zumasys) (Count VII); specific performance (against all defendants) (Count VIII);  punitive/treble damages (against all defendants) (Count IX); and breach of contract (against Cook) (Count X).  Long story short, Ashwood accuses

---

[12] Ashwood also cites S.D. Ohio Civ. R. 65.1(c), which counsel reads to permit "temporary assignment" to another district judge when the district judge to whom the civil action is assigned "is not reasonably available" to act upon a motion.  In practice, though, this local rule applies when a district judge (who draws a motion for a temporary restraining order) is physically absent from the Bench.

Zumasys and Cook of working together to cut it (and its stream of revenue) out of the jBASE licensing equation. As recompense, Ashwood seeks an award of (at least) $20 Million. (*See, e.g.*, Doc. 79 PAGEID 2240).

## II.    LAW & ANALYSIS

Together, Defendants move to dismiss Plaintiff's SAC in its entirety. Specifically, though, Zumasys and JII move to dismiss Counts I–IX (Doc. 81), and Cook moves to dismiss Counts II–IV, V–VI, and VIII–X. (Doc. 82).

### A.  Legal Standard

The Rule 12(b)(6) standard is well-established. To withstand a dismissal motion, a complaint must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Courts do not require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is <u>plausible</u> on its face." *Id.* at 570 (emphasis added).[13]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*). A district court examining the sufficiency of a complaint must accept the well-pleaded allegations of the complaint as true. *Id.*; *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 509 (6th Cir. 2014).

---

[13] "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of th[e] facts is improbable, and 'that a recovery is very remote and unlikely.'"  *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

On a Rule 12(b)(6) motion, a district court "may consider exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment."  *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (internal quotation marks and citation omitted); *Berryland Trading, Inc. v. Transp. Ins. Co.*, 754 F. App'x 370, 370 n.2 (6th Cir. 2018) (quoting *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).  The ability of the court to consider supplementary documentation has limits, however, in that it must be "<u>clear that there exist no material disputed issues</u> <u>of fact concerning the relevance of the document.</u>"  *Mediacom Se. LLC v. BellSouth Telecomms., Inc.,* 672 F.3d 396, 400 (6th Cir. 2012) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)) (emphasis added).

Two exhibits are attached to Ashwood's SAC.  The first is an email sent (on Thursday, February 26, 2004 5:34 PM) by JII's Sharon Cunningham to Ashwood's Rod Owens.  Its body text reads:

> Attached please find a copy of the Standard jBASE International Value Added Reseller agreement for Ashwood.  This agreement details the terms and conditions for licensing and reselling the jBASE International products and support offerings.  Schedule A lists the products and offerings covered by this agreement and Schedule B is our now current price list in US dollars.  I would like to draw your attention to Schedule C.  Schedule C describes the proposed discounts and pricing.
>
> If this agreement is acceptable, please print and sign **two copies** and return to my attention at the address below.  After execution, a signed copy will be returned to you.  If you have any questions please do not hesitate to call Bob [Markowitz] or me at 508-598-4100.

(Doc. 79-1 PAGEID 2242 (bold emphasis in original)).  An unsigned 17-page document titled "jBASE International Value Added Reseller Agreement" follows.  (*Id.* PAGEID 2243–59).  Clause 20(a) reads, "The term of this Agreement shall commence upon signature and acceptance by JII."  (*Id.* PAGEID 2246).  The second attachment is a 7-page Master Sales, License, and Support Agreement (dated August 18, 2012) between Ashwood and Cook.  (Doc. 79-2).  It was signed (on "9/25/2012") by Rusty Burns, Cook's Vice President of Global Purchasing (only).  (*Id.* PAGEID 2260, 2262, 2264, 2265).  Both documents are referred to in the SAC and are obviously relevant.

JII and Zumasys direct the Court to the declaration of Paul Giobbi, Zumasys' President, through which he authenticates his December 27, 2019 email terminating Ashwood's VAR Agreement.  (*See* Doc. 81 PAGEID 2271).[14]  As previously noted, Ashwood references Giobbi's email in ¶ 73 of the SAC and it is obviously relevant.

Finally, Ashwood alleges that, "[o]n or about May 19, 2020, Cook informed Ashwood that it was terminating its agreements with Plaintiff[ ]" and cites to "Exhibit 20".  (Doc. 79 (¶ 272)).  The Court will presume Ashwood meant to clarify that Cook's "Notice of Termination" was made part of the record when it was attached in support of Plaintiff's motion for a temporary restraining order and preliminary injunction.  (*See* Doc. 42-20).  This email, too, is obviously relevant.

A word generally about the testimony and additional documents adduced both in support of, and against, Ashwood's bid for injunctive relief.  Bits and pieces of this

---

[14] The Giobbi email was made part of the record when it was attached to the Declaration of Paul Giobbi (Doc. 17-1 PAGEID 91–92) submitted in support of Zumasys' motion to dismiss Ashwood's (original) Complaint (Doc. 17), which this Court later denied as moot (Doc. 26) after the First Amended Complaint (Doc. 25) was filed.

evidence have found their way into the memoranda under consideration before the Court today. This is surprising, because, under Rule 12(b)(6), their inclusion is wholly improper. In most (if not all) instances, these references will be disregarded by the undersigned without further comment.

## B. Defendants JII & Zumasys' Rule 12(b)(6) Motion

**Count I.** Ashwood's First Cause of Action alleges that JII and Zumasys breached the 2004 VAR Agreement by terminating it without cause on December 27, 2019. Defendants move to dismiss, claiming that, because the 2004 VAR Agreement is not executed, it is not enforceable.  In the alternative, and assuming the Court finds it plausible that the 2004 VAR Agreement is enforceable, Defendants argue: Ashwood failed to comply with a pre-litigation condition precedent (that was neither waived nor excused); the relief that Ashwood seeks is expressly barred by a limitation of liability provision; and the SAC fails to allege facts sufficient to demonstrate an actionable breach of contract.  (Doc. 81 PAGEID 2268–69, 2278–79).

The Court will first address which state law applies to Count I.

An Ohio federal court (like this one) sitting in diversity must apply the substantive law of Ohio[15] when deciding the claims before it, to include Ohio's choice of law[16] rules. In Ohio, the Restatement (Second) of Conflict of Laws governs choice of law questions. *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 288–89 (Ohio 1984).  But when "the parties to

---

[15] *See Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 822 n.5 (6th Cir. 2015) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 79 (1938)).

[16] *Charash v. Oberlin Coll.*, 14 F.3d 291, 295–96 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

a contract have made an effective choice of the forum law to be applied, the Restatement of the Law 2d, Conflict of Laws (1971) 561, Section 187(2), <u>will not be applied to contravene the choice of the parties</u> as to the applicable law." *Jarvis v. Ashland Oil, Inc.*, 478 N.E.2d 786, 789 (Ohio 1985) (emphasis added).[17]

Ashwood argues that Massachusetts law controls, because the 2004 VAR Agreement provides that it "shall be governed by the laws of the Commonwealth of Massachusetts, USA." (Doc. 86 PAGEID 3341 (quoting Doc. 79-1 PAGEID 2246 cl. 21(c))). JII and Zumasys respond that the Court need not decide whether to apply the law of Ohio or Massachusetts, because there is no conflict on the "determinative" issues. (Doc. 81 PAGEID 2280–81).

The Court agrees that the elements of a breach of contract claim are virtually the same. In Massachusetts, "a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform [its] part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016) (citing *Singarella v. Boston*, 173 N.E.2d 290, 291 (Mass. 1961)). Similarly, in Ohio, "a plaintiff must demonstrate by a preponderance of the evidence (1) that a contract existed, (2) that the plaintiff fulfilled [its] obligations, (3) that the defendant failed to fulfill [its] obligations, and (4) that damages

---

[17] "We further hold that where the law of the chosen state sought to be applied is concededly repugnant to and in violation of the public policy of this state, the law of Ohio will only be applied when it can be shown that this state has a materially greater interest than the chosen state in the determination of the particular issue." *Jarvis*, 478 N.E.2d at 789. "These [ ] comments by the Ohio Supreme Court indicate that Ohio choice-of-law principles strongly favor upholding the chosen law of the contracting parties." *Tele-Save Merch. Co. v. Consumer Distrib. Co., Ltd.*, 814 F.2d 1120, 1122 (6th Cir. 1987).

resulted from this failure." *BCG Masonic Cleveland, LLC v. Live Nation Entm't, Inc.*, 570 F. Supp. 3d 552, 560 (N.D. Ohio 2021) (cleaned up).

**Signature.**  JII and Zumasys maintain that, because the 2004 VAR Agreement is not signed by either Ashwood or JII, it is not enforceable.  In support, Defendants reference the February 26, 2004 cover/transmittal email from JII agent Sharon Cunningham to Ashwood principal Rod Owens.  (Doc. 79-1 PAGEID 2242).  It reads in pertinent part, "Attached please find a copy of the Standard jBASE International Value Added Reseller agreement for Ashwood. . . . <u>If this agreement is acceptable, please print and sign **two copies** and return to my attention</u> at the address below.  After execution, a signed copy will be returned to you."  (*Id.* (bold emphasis in original, other emphasis added)).  They also cite to cl. 20(a) of the Agreement, which reads: "The term of this Agreement shall commence upon signature and acceptance by JII."  (*Id.* PAGEID 2246).

"A contract may be effective even though the written instrument evidencing its terms has not been executed."  *Allen v. Ford Motor Co.*, 8 F. Supp.2d 702, 705 (N.D. Ohio 1998) (citation omitted).  "Where, however, the parties have agreed that a contract shall not be binding until signed by a particular person, party, or official, courts will give effect to that agreement, and thus will not enforce the contract without the requisite signatures." *Id.* (citations omitted); *see Rousseau v. Setjo, L.L.C.*, No. 109237, 2020 WL 6196168, at *2 (¶¶ 11,12) (Ohio Ct. App. 8th Dist. Oct. 22, 2020).

According to Defendants, the "signature requirement" was essential and a "condition precedent" to the effectiveness, and enforceability, of the 2004 VAR Agreement.  (Doc. 81 PAGEID 2286–87).

"Ohio law defines a condition precedent as 'one that is to be performed before the agreement becomes effective. It calls for the happening of some event, or the performance of some act, … before the contract shall be binding on the parties.'" *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 822 (6th Cir. 2015) (quoting *Mumaw v. W. & S. Life Ins. Co.*, 119 N.E. 132, 135 (Ohio 1917)). But "[i]n contract law, <u>conditions precedent are disfavored</u> and will not be found unless the agreement plainly shows an intent to the contrary." *Eagle Realty Invs., Inc. v. Dumon*, 201 N.E.3d 963, at ¶ 12 (Ohio Ct. App. 1st Dist. 2022) (cleaned up) (emphasis added); *Mollett v. Lawrence Cnty. Bd. of Developmental Disabilities*, No. 22CA6, --- N.E.3d ---, at ¶ 51, 2024 WL 1638378, at *8 (Ohio Ct. App. 4th Dist. Apr. 8, 2024) (citing *Eagle Realty Invs.*). Moreover, it is a "basic principle of contract law that a party to a contract who would benefit from a condition precedent to its performance may waive that condition." *Cameron v. Ocwen Loan Servicing, LLC*, No. 2:18-cv-428, 2019 WL 6020585, at *7 (S.D. Ohio Nov. 14, 2019) (quoting *Sweeney v. Grange Mut. Cas. Co.*, 766 N.E.2d 212, 216 (Ohio Ct. App. 8th Dist. 2001)). A condition precedent is "excused" if the party asserting its existence "waives" or "voluntarily relinquishes" that condition. *Id.* (citing *Sweeney*). "When a condition is excused, its nonperformance is <u>no bar to recovery</u> on the contract." *Id.* (quoting *Sweeney*) (emphasis added).

For purposes of deciding whether Ashwood has plausibly alleged that the 2004 VAR Agreement was effective and is enforceable, the Court determines that the "signature requirement" argued by Defendants is not a condition precedent under Ohio law. To begin with, the Sharon Cunningham email (on which both Ashwood and Defendants rely) is not part of the Agreement. Regardless, though, it simply asks Rod

Owens to "please" sign the Agreement. The email fails to alert him (or refer him to any provision within the "Standard jBASE International Value Added Reseller agreement") as to what will happen, or more precisely, what will *not* happen, if Ashwood does not sign. True, cl. 20(a) speaks to when the term of the Agreement "shall commence[.]" But that is not the same as "plainly" spelling out under what circumstance(s) the term of the Agreement will *not* commence. Finally, even if the "signature requirement" was a condition precedent, Ashwood alleges performance under the Agreement (*see, e.g.*, Doc. 79 (¶ 24)), which plausibly operates as a waiver on JII's part. *See Allen*, 8 F. Supp.2d at 706 ("Where the signature of one of the parties is a condition precedent to a binding contract, that condition may be waived by performance under the contract, as such performance indicates that the contract has been accepted.") (citations omitted).[18]

**Pre-litigation condition precedent & limitation of liability provision.** In the event the Court finds that Ashwood has plausibly alleged that the 2004 VAR Agreement was effective and is enforceable, JII and Zumasys contend that dismissal is still proper because Ashwood failed to comply with cl. 17(g) and because the damages Ashwood seeks ($20,000,000) are at odds with cl. 17(e)(ii).

Clause 17 is titled, "Limitation of Liability, Damages and Actions." It reads as follows:

> a) The following provisions set out JII's entire liability (including any liability for the acts and omissions of its employees[,] agents and sub-contractors) to VAR in respect of:

---

[18] Massachusetts law does not brook a different result. "'Emphatic words' are generally considered necessary to create a condition precedent that will limit or forfeit rights under an agreement." *Mass. Mun. Wholesale Elec. Co. v. Danvers*, 577 N.E.2d 283, 288 (Mass. 1991) (citations omitted). *See, e.g., Canton v. Thomas*, 162 N.E. 769, at ¶ 1(Mass. 1928) (the phrase "if and when," but not "when" alone, creates a condition precedent).

i)      any breach of its contractual obligations arising under this agreement; and

ii)      any representation[,] statement or tortuous (sic) act or omission including negligence arising under or in connection with this Agreement.

**AND VAR's ATTENTION IS IN PARTICULAR DRAWN TO THE PROVISION OF THIS CLAUSE 17.**

b) Any act or omission on the part of JII or its employees, agents or sub-contractors falling within clause 17.(a) above shall for the purposes of this clause 17 be known as an 'Event of Default'.

. . . .

e) Subject to the limits set out in clause 17.(e)(ii) below[,] JII shall accept <u>liability to VAR</u> in respect of any Event of Default <u>shall be limited to damages of an amount equal to</u>: . . . ii) in the case of any other Event of Default <u>the aggregate of the License fees paid in the immediately preceding period of twelve (12) months</u>.

f) Subject to clause 17 (c ) above[,] <u>JII shall not be liable to VAR</u> in respect of any Event of Default <u>for loss of profits</u>[,] goodwill or any type of special indirect or consequential loss (including loss or damage suffered by VAR as a result of an action brought by a third party) even if such loss was reasonably foreseeable or JII had been advised of the possibility of VAR incurring the same.

g) <u>VAR agrees to afford to JII not less than sixty (60) days</u> (following notification thereof by VAR) <u>in which to remedy any Event of Default</u> hereunder.

(Doc. 79-1 PAGEID 2245–46 (bold emphasis in original, other emphasis added)).

First (and in reverse order), whether cl. 17(e)(ii) limits Ashwood (as VAR) as to the *amount* of damages it can recover from JII and Zumasys for breach of contract does not defeat the plausibility of the contract claim itself.[19] Second, neither Ohio nor Massachusetts law allow this Court to construe the language of cl. 17(g) as a (disfavored)

---

[19] The Court does not reach Ashwood's argument that cl. 17(e)(ii) is, under Massachusetts law, an impermissible liquidated damages clause. (Doc. 86 PAGEID 3356–58).

condition precedent to Ashwood filing a civil action against JII. The word "Actions" plainly appears in the title of cl. 17; but it just as plainly does *not* appear in cl. 17(g). JII and Zumasys basically suggest we read in the prepositional phrase "before filing a civil action" after the word "hereafter" to undermine the plausibility of Ashwood's breach of contract claim. The Court will decline to do so.[20]

**Failure to allege facts in support of actionable termination.** Zumasys' President Paul Giobbi "unilaterally terminated" JII's 2004 VAR Agreement with Ashwood in an email dated December 27, 2019. (*See* Doc. 79 (¶ 73); Doc. 17-1 PAGEID 93 ("[P]lease be advised that jBASE hereby gives notice that the Value Added Reseller Agreement between jBASE and Ashwood will terminate on the 90th day after this notice is provided to Ashwood.")). Ashwood alleges, though, that the 2004 VAR Agreement "could only be terminated for <u>specific</u> causes[,]"[21] none of which occurred.

Clause 18 is titled "Termination." It reads as follows:

> In addition to JII's rights to terminate this Agreement for violation of its proprietary rights set forth previously, either party may terminate this Agreement and all licenses hereunder upon the occurrence of any of the following events:
>
> a) **Insolvency.** Except as may be prohibited by applicable bankruptcy law, in the event of VAR's or JII's insolvency or its inability to pay debts as they become due, or the filing of a voluntary bankruptcy proceeding by or against either party, or the appointment of a receiver or assignee for the benefit of either

---

[20] The Court does not reach Ashwood's argument that it gave JII "far more than sixty(60) days to remedy its decision to breach the RESELLER AGREEMENT." (Doc. 86 PAGEID 3351–52).

[21] (Doc. 79 (¶ 141) (emphasis added); *see id.* (¶ 153)). Ashwood also alleges that "[n]o good cause exist[ed] for [its] termination as Zumasys' Reseller of Record to Cook under the VAR Agreement." (Doc. 79 (¶ 142); *see id.* (¶ 154)). This, however, is a legal conclusion, not a statement of fact, which the Court need not (and, here, will not) accept as true. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

party's creditors, either party may elect to cancel any unfulfilled obligations hereunder.   <u>Either party may terminate this agreement forthwith upon the bankruptcy or proven insolvency of the other.</u>

b) **Breach by Either Party.**   Either party fails to perform any substantial obligation herein on its part to be performed, unless such breach shall be cured within thirty (30) days following notice of such default from the other party.

c) **Assignment.**   Any assignment or attempted assignment of this Agreement by VAR in whole or in part, or of any other interest hereunder without JII's prior written consent, and any such assignment or attempted assignment shall be void.   Upon default JII may pursue any and all of its rights and remedies hereunder at law and at equity.   JII shall be free to assign this Agreement. <u>Either party may terminate this Agreement upon ninety (90) days written notice to the other party.</u>

(Doc. 79-1 PAGEID 2246 (bold emphasis in original, other emphasis added)).  In support of their Rule 12(b)(6) motion, Defendants argue that the sentence—"Either party may terminate this Agreement upon ninety (90) days written notice to the other party."—is a "termination for convenience" clause.  But it does not stand alone.  Rather, it concludes a subparagraph that speak to the rights of the parties if JII (but *not* Ashwood as VAR) assigns the Agreement.  This sentence is plausibly interpreted as an "escape" clause available to *Ashwood* (or even to the assignee) in the event of an assignment.[22]  Whether it is available to Zumasys (as assignee) would depend on the details of its "purchase" of JII, which are not alleged in the SAC.  Dismissal, therefore, is, at best, premature.

The Court notes that there is no "headings for convenience" clause in the 2004 VAR Agreement.  That is, JII did not include a clause in its "standard" agreement disclaiming that headings are simply a means to organize text and do *not* affect meaning

---

[22] (*See generally* Doc. 79 (¶ 98)).

or interpretation.  This omission (plausibly creating ambiguity) is properly construed against JII as drafter.  *See Savedoff v. Access Group, Inc.*, 524 F.3d 754, 764 (6th Cir. 2008) (applying Ohio law); *Benalcazar v. Goldsmith*, 507 N.E.2d 1043, 1045 (Mass. 1987).

For all these reasons, JII and Zumasys' motion to dismiss Count I for failure to state a claim will be DENIED.

**Count II.**  Ashwood's Second Cause of Action alleges a breach of the implied covenant of good faith and fair dealing against (JII and) Zumasys.  "Under Ohio law, there is an implied duty of good faith and fair dealing in every contract."  *Accurate Elec. Constr., Inc. v. Ohio State Univ.*, 149 N.E.3d 1080, at ¶ 130 (Ohio App. 10th Dist. 2019) (cleaned up).  Similarly, the "implied covenant of good faith and fair dealing[ is] a common-law doctrine applicable to every contract in Massachusetts."  *Eigerman v. Putnam Invs., Inc.*, 877 N.E.2d 1258, 1264 (Mass. 2007).  This is true even in contracts "between sophisticated businesspeople[.]"  *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 821 (Mass. 1991).  Relevant here, however, the covenant does not give rise to an "independent" cause of action under either Ohio or Massachusetts law.  *See Weekes v. Cohen Cleary P.C.*, No. 23-10817-NMG, --- F.Supp.3d ---, 2024 WL 1159642, at *5 (D. Mass. Mar. 15, 2024); *Am. Metal Stamping Co., LLC v. Pittsburg Pipe & Supply Corp.*, No. 1:12CV2334, 2022 WL 19349958, at *2–3 (N.D. Ohio Oct. 14, 2022) (collecting cases in the Sixth Circuit applying Ohio law).  Therefore, JII and Zumasys' motion to dismiss Count II will be GRANTED.[23]

---

[23] This ruling is not a determination on the merits question of whether Zumasys acted in good faith, or dealt fairly, vis-à-vis JII's contractual obligations to Ashwood as VAR.

**Counts III & IV.** Ashwood allows that its allegations regarding promissory estoppel (Count III) and unjust enrichment (Count IV) are allegations pled in the alternative. (Doc. 86 PAGEID 3362). The Court's determination that Ashwood has plausibly alleged a breach of the 2004 VAR Agreement renders moot Ashwood's "quasi-contract" remedies. (*See id.*).[24] Accordingly, JII and Zumasys' motion to dismiss Counts III and IV will be GRANTED.

**Count V.** Ashwood's Fifth Cause of Action alleges that JII and Zumasys tortiously interfered with Ashwood's contractual relationship with Cook by inducing Cook to breach the Master Agreement. As a result, Cook sends payment to JII and Zumasys rather than to Ashwood, running dry Ashwood's revenue stream. It further alleges that JII and Zumasys tortiously interfered with Ashwood's sales and license agreements with its "other" (unidentified) jBASE customers with the same result.

The parties agree that Ohio law governs this tort claim, requiring Ashwood to plead facts establishing: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach[25]; (4) the lack of justification; and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999) (reaffirming *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, syl. ¶ 2 (Ohio 1995)); *Couzens v. Union Bank & Trust Co.*, 234 N.E.3d 661, at ¶ 14 (Ohio Ct. App. 1st Dist. 2024) (citing *Kenty*); *Miami Valley Mobile Health*

---

[24] "The triggering mechanism for the operability of Plaintiff's quasi-contract claims is whether this Court elects to dismiss Plaintiff's contract claims." (Doc. 86 PAGEID 3362).

[25] "A claim for tortious interference with a contract 'requires the plaintiff to prove, as an element, an actual *breach* of contract.'" *BCG Masonic Cleveland,* 570 F.Supp.3d at 558 (quoting *Lamson & Sessions Co. v. Peters*, 576 F. App'x 538, 542 (6th Cir. 2014) (emphasis added) (citing *Fred Siegel Co.*)).

*Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F.Supp.2d 925, (S.D. Ohio 2012) (citing

*Kenty*).

JII and Zumasys point to allegations within the SAC that Cook *solitarily* wanted out

of its contract[26] and claim that this defeats the intent element.[27] It does not. Rather, "[t]o

establish the intent element of a tortious interference with contract claim, a plaintiff must

either (1) prove that the defendant acted with the purpose or desire to interfere with the

---

[26] (*See* Doc. 79 (¶ 131) ("Cook has been seeking to terminate Ashwood's rights [      ] since 2012 when it began making overtures to Zumasys to find some way to eliminate Ashwood as JII's Reseller of Record under the VAR Agreement."); (¶ 132) ("[I]n June 2019 or thereabouts, Robert Breedlove, in the scope and course of his employment with Cook once again approached Zumasys with the intent of cutting Ashwood out of the picture and of depriving Ashwood from receiving the benefits and profits it derived from its jBASE VAR Agreement[.]"); (¶ 133) ("[A]s an inducement to Zumasys to breach the VAR Agreement, Cook offered to split what would have been Ashwood's revenues from the continuing license and service fees that Cook would save, if Zumasys were to terminate Ashwood's contract as the jBASE Reseller of Record to Cook.") (all emphases added)).

[27] The Court tracks several other such allegations. (*See* Doc. 79 (¶¶ 61, 63) ("Concurrently and coincident with Zumasys' efforts to force Ashwood to execute a new agreement in 2017 [that would allow JII to terminate it without cause], Cook began to send signals that it wanted to terminate its Service Agreements with Ashwood and to continue with JII instead."); (¶ 64) (Cook sent a notice of termination to Ashwood on October 31, 2017[.] Ashwood responded with letters to both Zumasys and Cook advising both Defendants of Ashwood's rights under [the 2004 VAR Agreement] and the illegality of terminating Ashwood's contract and of interfering with Ashwood's contract with Zumasys."); (¶ 65) ("Upon receiving Ashwood's admonition that Cook's conduct constituted an interference with Ashwood's contract with JII, Cook backed away from its termination position and continued to use and pay for the services of Ashwood to the present."); (¶ 66) ("However, in June of 2019, Paul Giobbi informed Ashwood that he had met with Cook, personally, and that David Breedlove of Cook had told him he wanted Zumasys to eliminate Ashwood as the Reseller to Cook and to allow Cook to deal directly with Zumasys."); (¶ 67) ("Mr. Breedlove followed up his request to Paul Giobbi with a letter to him dated June 7, 2019 requesting the right to deal directly with Zumasys."); (¶ 68) ("In September of 2019, Paul Giobbi made several proposals to Ashwood under which Zumasys would take over Ashwood's end-user, Cook, and deal with the directly, cutting out future renewal and license fee payments that Ashwood had already earned by selling over 6,000 sub-licenses to Cook."); (¶ 70) ("Ashwood sent a letter to Paul Giobbi on September 9, 2019 advising Mr. Giobbi that he had no contractual right to take over Ashwood's end-user, Cook or deprive Ashwood of the further revenues Ashwood had already earned."); (¶ 71) ("On November 21, 2019, Paul Giobbi emailed Ashwood stating that it was putting an end date on Ashwood's role as Zumasys' value added reseller to Cook.") (¶ 72) ("Finally, in a telephone conversation between Rod Owens and Paul Giobbi on December 5, 2019, Paul Giobbi informed Ashwood that it was terminating its VAR with Ashwood unless Ashwood gave up Ashwood's end-user, Cook."); (¶ 134) ("On or about December 5, 2019, Paul Giobbi of Zumasys informed [Ashwood] that at the request of Robert Breedlove and Cook that Zumasys was terminating its contract with Ashwood[.]"); (¶ 135) ("Paul Giobbi informed [Ashwood] that it was taking that action because Robert Breedlove and Defendant Cook had requested on several occasions that Zumasys terminate its agreement with [Ashwood]."); (¶ 73) ("In an email dated December 27, 2019 Paul Giobbi followed up the December 5th telephone conversation and unilaterally terminated Ashwood's VAR agreement.") (all emphases added)).

performance of the contract or (2) prove that the defendant knew that interference was certain or substantially certain to occur as a result of its actions." *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, at ¶ 17 (Ohio Ct. App. 12th Dist. 2015). The rule applies "to an interference that is incidental to the actor's independent purpose and desire but known to him as a necessary consequence of his action." *Id.* (quoting 4 Restatement (Second) of Torts § 766 cmt. j (1979)). In other words, "intentional procurement" is not the equivalent of "hatching" the plan. Inasmuch as this is the only argument these Defendants make, JII and Zumsays' motion to dismiss Count V for failure to state a claim will be DENIED as it relates to Cook. And, because these Defendants do not address Ashwood's reference to its "other" (unidentified) jBASE customers, the motion will be DENIED as to them as well.

**Count VI.** Ashwood's Sixth Cause of Action alleges that JII and Zumasys tortiously interfered with Ashwood's *business* (versus contractual) relationship with Cook and with "other" (unidentified) jBASE customers. "'The main distinction between tortious interference with a contractual relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract.'" *Miami Valley Mobile Health Servs.*, 852 F.Supp.2d at 942 (quoting *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, at ¶ 23 (Ohio Ct. App. 3d Dist. 2002)) (emphases added); *Scaccia v. Lyft, Inc.*, No. 3:21-cv-29, 2021 WL 4355521, at *3 (S.D. Ohio Sept. 24, 2021) (citing *Miami Valley Mobile Health Servs.*); *see Georgia-Pacific Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012) (claims for tortious interference with contractual relationships and business relations are

"nearly identical" under Ohio law); *Edelstein v. Stephens*, No. 1:17-cv-305, 2021 WL 1168254, at *3 n. 2 (S.D. Ohio Feb. 22, 2021) (same).

The Court presumes that this claim, much like Ashwood's quasi-contractual claims, was pled in the alternative. As such, it is rendered moot by Cook's concession that a contract between it and Ashwood—the Master Agreement—was once in place. (*See* Doc. 82 PAGEID 2313). Accordingly, JII and Zumasys' motion to dismiss Count VI will be GRANTED as it relates to Cook. But because these Defendants do not address Ashwood's reference to its "other" (unidentified) jBASE customers, the motion will be DENIED as to them.

**Count VII.** Ashwood's Seventh Cause of Action alleges that JII and Zumasys' conduct was undertaken to "destroy [its] rights" under the 2004 VAR Agreement and to "coerce" a surrender of its revenues as the Reseller of Record to Cook, in violation of Mass. Gen. Laws ch. 93A, § 11 prohibiting unfair trade practices.[28] Ashwood fails to plead, however, that "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." *Id.* (emphasis added). Instead, Ashwood avers that "Defendants, jBASE and Zumasys, have entered into contracts and ha[ve] engaged in other conduct in Cincinnati, Ohio, which conduct has given rise to the Plaintiff's [Second

---

[28] "To trigger liability under c. 93A, courts have said that the conduct in question must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce, … have an extortionate quality that give it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness …" *O'Hara v. Standard Fire Ins. Co.*, No. 16-cv-12378-GAO, 2017 WL 8315886, at *6 (D. Mass. Sept. 8, 2017) (quoting *Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, 217 F.3d 33, 40 (1st Cir. 2000)).

Amended] Complaint." (Doc. 79 (¶ 6) (emphasis added)).[29] If there is no way to "link the events at issue, or the harm allegedly suffered by Plaintiff, to the state of Massachusetts[,]" the complaint is properly dismissed. *Weber v. Sanborn*, 502 F.Supp.2d 197, 199–200 (D. Mass. 2007). Accordingly, JII and Zumasys' motion to dismiss Count VII for failure to state a claim will be GRANTED.

**Count VIII.** Ashwood's Eighth Cause of Action seeks specific performance from JII and Zumasys. Defendants are correct that "[s]pecific performance is not a cause of action per se, but is an equitable remedy for breach of an enforceable contract." (Doc. 81 PAGEID 2301). It is, under Ohio law, "the exception to the general rule that the appropriate remedy for the breach of a contract is an action at law to recover damages for the breach." (*Id.* PAGEID 2302).

Defendants argue that Ashwood "has not pled that monetary damages would be an inadequate form of relief[.]" (*Id.*). To the contrary, Ashwood "admits that it can calculate with 'mathematical certainty' its past and future damages for each and every of the 6,583 licenses it has sold Cook." (*Id.* (citing Doc. 79 (¶¶ 57, 99)). In addition, Ashwood "asserts its damages are $20,000,000[.]" (*Id.* (citing Doc. 79 (¶¶ 157, 162, 166, 173, 179, 185, 190, 197, 207, 214, 224, 230, 275)).

Ashwood concedes, citing Massachusetts law, that "[o]ne cannot have damages for the breach of a contract, and a decree also for its specific performance. Not because the remedies are inconsistent. On the contrary, they are alternative." (Doc. 86 PAGEID

---

[29] (*See* Doc. 79 (¶ 11) ("The VAR Agreement (Exhibit 1) was entered into in the State of <u>Ohio</u>, and said contract was to be performed in substantial part within the State of <u>Ohio</u>."), (¶ 12) ("The License Agreement (Exhibit 2) was entered into in the State of <u>Ohio</u>, and said contract was to be performed in substantial part within the State of <u>Ohio</u>.") (emphases added); *see id.* (¶ 13)).

3372 (quoting *Perroncello v. Donahue*, 859 N.E.2d 827, 831 (Mass. 2007) (cleaned up)). To this end, Ashwood maintains that the Court "may order specific performance if it finds such remedy to be practicable."  (*Id.* (quoting Mass. Gen. Laws ch. 214, § 1A)).

At bottom, whether under Ohio[30] or Massachusetts[31] law, specific performance is a remedy[32] and not a separate cause of action.  Accordingly, JII and Zymasys' motion to dismiss Count VIII will be GRANTED.

**Count IX.**  Ashwood's Ninth Cause of Action seeks an award of punitive damages against JII and Zymasys for "inducing" Cook to breach the Master Agreement.  In opposition to their Rule 12(b)(6) motion, Ashwood argues only Ohio law.  (Doc. 86 PAGEID 3372–73).  "Punitive damages are not an independent cause of action; rather, they arise incident to compensable harm."  *Whetstone v. Binner*, 57 N.E.3d 1111, at ¶ 20 (Ohio 2016); *Ross v. PennyMac Loan Services LLC*, 761 F. App'x 491, 497 (6th Cir. 2019) (citing *Whetstone*, "In Ohio, punitive damages are a remedy rather than a cause of

---

[30] *CenterPoint Claims Serv., Inc. v. Nationwide Mut. Ins. Co.*, No. 2:20-cv-3779, 2021 WL 9681473, at *3 (S.D. Ohio Aug. 4, 2021).

[31] *Barnia v. Kaur*, 646 F.Supp.3d 154, 173 n.5 (D. Mass. 2022).

[32] "The Court will address the appropriateness of this remedy, should it become relevant, at a later date." *Barnia*, 646 F.Supp.3d at 173 n.5.

action.").[33]  Thus, JII and Zumasys' motion to dismiss Count IX will be GRANTED.[34]  *See*

*Saalim v. Walmart, Inc.*, 97 F.4th 995, 1015 (6th Cir. 2024) (citing *Whetstone*, "Because

[plaintiff] had improperly asserted [a] claim [for punitive damages] as an individual count

in [its] complaint, the district court properly dismissed this count.").

## C. Defendant Cook's Rule 12(b)(6) Motion[35]

**<u>Count X.</u>**  Ashwood's Tenth Cause of Action alleges a breach of contract claim

against Cook.[36]  To establish this claim under Ohio law, Ashwood must prove:

---

[33] In Ohio, "actual malice" is the standard set by the Ohio Supreme Court:

> [A]ctual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.  In the latter case, before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware [its] act had a great probability of causing substantial harm.  Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety.  If submitted to the jury, the trail court should give an instruction in accordance with the law we announce today.

*Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987).

[34] The Court does not—indeed cannot—rule on whether Ashwood may eventually be entitled to an award of punitive damages from these defendants.  Under *Whetstone*, Ashwood first must prevail on a substantive cause of action and receive compensatory damages; only then would Ashwood (possibly) have an opportunity to prove (to the trier of fact by clear and convincing evidence) that they acted with "malice".  57 N.E.3d 1111, at ¶ 20.  And even if (after the close of evidence) the trial court permits the issue to go to the jury, "an award of punitive damages is not automatic."  *Id.*

[35] Cook and Ashwood agree that all of Ashwood's claims against Cook are governed by Ohio law (*see* Doc. 87 PAGEID 3848), to include Ashwood's breach of contract claim, because the Master Agreement between Ashwood and Cook provides that it "shall be construed and governed by the laws of the State of Ohio."  (Doc. 82 PAGEID 2310 (citing Doc. 79-2 PAGEID 2263 (Application Software License Agreement Terms & Conditions ¶ 14); *id.* PAGEID 2261 (Sales & License Agreement Terms & Conditions ¶ 5); *id.* PAGEID 2264 (Software Support Agreement ¶ 10)).

[36] This claim against Cook was not pled in either the (original) Complaint or the First Amended Complaint.  Ashwood explains, "[i]t was not until June of 2020, after Plaintiff filed its First Amended Complaint that Cook committed its first act of breach.  That act: It failed to pay its monthly Renewal and Service Fees and it retained possession and use of the jBASE software that Ashwood had sub-licensed to it."  (Doc. 87 PAGEID 3848).

the existence of a contract; that it fulfilled its obligations, but Cook did not; and, because of Cook's failure, it incurred damages.  *Brock v. Servpro*, 183 N.E.3d 491, at ¶ 31 (Ohio Ct. App. 12th Dist. 2022); *BCG Masonic Cleveland,* 570 F. Supp. 3d at 560.  Unlike JII and Zumasys, Cook concedes the existence of a contract, the Master Agreement.  (*See* Doc. 82 PAGEID 2313).[37]  Cook's concessions end there, however.

Cook maintains that Ashwood is "mistaken" about the terms of the Master Agreement.  Yet what it argues is that Ashwood is mistaken about what those terms *mean*.  Cook may prevail on summary judgment or convince a jury that that's the case. But at the motion-to-dismiss stage, it doesn't mean Ashwood hasn't plausibly alleged a breach of contract.

Ashwood alleges that the Master Agreement required Cook "to continue to pay Ashwood's service and renewal fees for as long as Cook continued to utilize the jBASE software, which Ashwood had sublicensed to Cook over the years."  (Doc. 79 (¶ 270)). But "in the event that Cook terminated its agreement with Ashwood or failed to continue to pay the service and renewal fees it was required to pay to Ashwood, Cook was required to remove all copies of the jBASE software sub-licensed to it by Ashwood and to return all copies to Ashwood."  (*Id.* (¶ 271)).  The relevant provision of the Master Agreement reads:

> Ownership of all Software (including any derivative or modification thereof) provided under this Agreement remains with Ashwood. Upon receipt of payment of the Initial License Fee, Customer is granted a non-exclusive, nontransferable license to use the Software solely on the specified Equipment.  The license continues only for so

---

[37] Cook makes this concession even though the Master Agreement attached as an exhibit to the SAC does not bear the signature of Ashwood principal Rod Owens.  (*See* Doc. 79-2 PAGEID 2260, 2262, 2264, 2265).

<u>long as Monthly License Fees</u> (if any are specified) <u>are paid when</u> <u>due</u> and terminates upon the earlier of non-payment, transfer of the Equipment on which the Software was licensed or cessation of use of the Software thereon, . . . <u>Upon termination of the license,</u> <u>Customer shall immediately return to Ashwood all copies of the</u> <u>Software</u>. . . .

(Doc. 79-2 PAGEID 2261 (Sales & License Agreement Terms & Conditions ¶ 3) (emphases added)).  In its papers opposing dismissal, Ashwood remarks, "What could be clearer?  Cook is required to make the monthly payments or return the software.  Since June of 2020, Cook has done neither.  This is a clear breach of an express term of the MASTER AGREEMENT."  (Doc. 87 PAGEID 3849).

Nowhere in the Master Agreement is "software" defined.  Upon termination, though, Cook must "promptly deliver" to Ashwood "all magnetic tapes, disk images, cards, firmware chips, printed circuit boards, and or other tangible items and material embodying the Software and documentation of the software and shall also either promptly return to [Ashwood] all copies thereof or destroy such copies and warrant in writing to [Ashwood] that all copies have been destroyed."  (Doc. 79-2 PAGEID 2261 (Application Software License Agreement Terms & Conditions ¶ 3)).  About this, Cook contends it "did not obtain jBASE software (a) from Ashwood, or (b) via any tangible device.  Rather, [it] downloaded the software directly from jBASE, and then obtained license keys from Ashwood.  So after terminating the Master Agreement, there was nothing to return or deliver to Ashwood."  (Doc. 82 PAGEID 2313–14 (citing Doc. 62 PAGEID 1973)). And, explaining further, Cook avows it "stopped using the license keys it received from Ashwood—the only thing it received from Ashwood—and instead obtained license keys from jBASE. . . [So] Cook

had no contractual duty to pay Ashwood's service or renewal fees." (*Id.* PAGEID 2314 (same)). In short, no duty, no breach.

Cook's narrative is a merits argument. Its motion to dismiss Count X for failure to state a claim will be DENIED.

**Count II.** Ashwood's Second Cause of Action alleges a breach of the implied covenant of good faith and fair dealing against Cook. As earlier noted, "[u]nder Ohio law, there is an implied duty of good faith and fair dealing in every contract." *Accurate Elec. Constr.,* 149 N.E.3d 1080, at ¶ 130 (cleaned up). "However, the covenant of good faith is part of a contract claim and does not stand alone as a separate cause of action from a breach of contract claim." *Id.*, at ¶ 131 (cleaned up). "Thus, a claim for breach of contract subsumes the accompanying claim for breach of the duty of good faith and fair dealing." *Id.* Federal courts in the Sixth Circuit that have applied Ohio law agree that it bars an *independent* claim for breach of the covenant of good faith and fair dealing. *Am. Metal Stamping Co.,* 2022 WL 19349958, at *2–3. Therefore, Cook's motion to dismiss Count II will be GRANTED.[38]

**Counts III & IV.** Ashwood again allows that its allegations regarding promissory estoppel (Count III) and unjust enrichment (Count IV) are allegations pled in the alternative. (Doc. 87 PAGEID 3863–64). As noted, Cook concedes the existence of a contract with Ashwood, the Master Agreement. Cook's concession renders moot

---

[38] This ruling is not a determination on the merits question of whether Cook acted in good faith, or dealt fairly, vis-à-vis its contractual obligations to Ashwood.

Ashwood's "quasi-contract" remedies. (*See id.*).[39] Accordingly, Cook's motion to dismiss Counts III and IV will be GRANTED.

**Count V.** Ashwood's Fifth Cause of Action alleges that Cook tortiously interfered with Ashwood's contractual relationship with JII by inducing Zumasys to breach the 2004 VAR Agreement.[40] Cook seeks dismissal based on the Giobbi termination letter, which, it insists, paints *Ashwood* as the "wrongdoer". (Doc. 82 PAGEID 2317–18 & Doc. 17-1 PAGEID 93 ("Rod, despite my efforts to work with you to foster and maintain a relationship between Zumasys and Ashwood and between Cook Medical and jBASE International, you seem extremely reticent about doing so and appear determined to pursue litigation around a contrived dispute based on your intentional misrepresentation and distortion of what we discussed.")). But, considered alongside the numerous other allegations within the SAC,[41] it does not foreclose "[a ] reasonable inference that [Cook] is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678. Cook's motion to dismiss Count V for failure to state a claim will be DENIED.

**Count VI.** Ashwood's Sixth Cause of Action alleges that Cook, with "full knowledge of [its] long-standing business relationship" with JII, "intentionally and improperly interfered" with that relationship <u>by inducing JII to terminate Ashwood's position as Reseller of Record to **Cook**</u>." (Doc. 79 (¶¶ 210, 211) (all emphasis added)).

---

[39] "The triggering mechanism for the operability of Plaintiff's quasi-contract claims is whether this Court elects to dismiss Plaintiff's contract claims." (Doc. 87 PAGEID 3864).

[40] Cook preliminarily argues that this claim fails because the 2004 VAR Agreement is not a valid and enforceable contract, but, assuming otherwise, JII properly terminated it (upon 90 days' notice). (Doc. 82 PAGEID 2314–16). These arguments have already been considered (and discounted) for purposes of Rule 12(b)(6).

[41] *See supra* notes 24 & 25.

Cook, however, "cannot tortiously interfere with [its] <u>own</u> business relationship." *Southward v. FedEx Freight, Inc.*, 98 F. Supp. 3d 926, 933 (S.D. Ohio 2014) (quoting *Dolan v. Glouster*, 879 N.E.2d 838, 848 (Ohio Ct. App. 4th Dist. 2007) (emphasis added)). Consistent with this premise, Cook's motion to dismiss Count VI for failure to state a claim will be GRANTED.

**Count VIII.**  Ashwood's Eighth Cause of Action seeks specific performance from Cook as *remedy* for its alleged breach of the Master Agreement.  Cook points out the obvious—a remedy is not a cause of action.[42]  Consequently, Cook's motion to dismiss Count VIII for will be GRANTED.[43]

**Count IX.**  Ashwood's Ninth Cause of Action seeks an award of punitive damages against Cook for "inducing" JII and Zumasys to breach the 2004 VAR Agreement.  Cook's motion to dismiss Count IX will be GRANTED, because, as noted respecting JII and Zumasys' companion motion, "In Ohio, punitive damages are a remedy rather than a cause of action."  *Whetstone*, 57 N.E.3d 1111, at ¶ 20.[44]

---

[42] Ashwood's breach of contract action asserts claims against Cook for both money damages as well as a specific performance.  Ashwood does not appear to dispute the principle that the equitable remedy of specific performance "is only available when no other remedies are available at law."  *Reed v. Triton Servs., Inc.*, 15 N.E.3d 936, at ¶ 11 (Ohio Ct. App. 12th Dist. 2014).

[43] Whether Ashwood is entitled to specific performance from Cook will be decided only after it proves a breach of the Master Agreement *and* establishes that money damages are not an adequate remedy.

[44] Again, and with reference to JII and Zumasys, the Court does not—indeed cannot—rule on whether Ashwood may eventually be entitled to an award of punitive damages from Cook.  *See supra* note 34.

## III.     CONCLUSION

For the foregoing reasons: (1) Defendants jBASE International, Inc. and Zumasys, Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 81) is **GRANTED** as to Counts II, III, IV, VI (regarding Defendant Cook Inc. only), VII, VIII & IX but is otherwise **DENIED**; and (2) Defendant Cook Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 82) is **GRANTED** as to Counts II, III, IV, VI, VIII & IX but is otherwise **DENIED**.   That is to say, **Counts I, V, VI (regarding Plaintiff Ashwood Computer Co., Inc.'s other jBASE customers) & X** survive, as these claims are plausible under the generous pleading standards of Fed. R. Civ. P. 12(b)(6).

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT